UNITED STATES of America, Appellee,

v.

Manuel Glenn ABASCAL, Appellant.

UNITED STATES of America, Appellee,

v.

Paul Gordon FRAKES, Appellant.

Nos. 75–1093 and 75–2052.

United States Court of Appeals,
Ninth Circuit.

March 18, 1977.

Rehearing and Rehearing En Banc
Denied Dec. 2, 1977.

Michael S. Hegner, El Cajon, Cal., argued for Abascal.

Terry J. Knoepp, U. S. Atty., James W. Brannigan, Robert D. Krause, Asst. U. S. Attys., San Diego, Cal., argued for the United States.

Gilbert Eisenberg, Ann Cummings, Atty., San Francisco, Cal., argued for Frakes.

William J. Corcoran, argued, Washington, D. C., for appellee in 75–1093.

Before TRASK, GOODWIN and WAL-LACE, Circuit Judges.

GOODWIN, Circuit Judge:

Paul Gordon Frakes and Manuel Glenn Abascal were convicted of multiple counts of violating 21 U.S.C. § 841 and related statutes which denounce possession and distribution of certain drugs, as well as conspiracy to engage in illegal drug transactions. Their combined appeals present a number of issues common to both appellants, and others that relate to each one individually.

An enterprise distributing large quantities of LSD, involving as many as fifteen suspects, was discovered when an undercover agent of the San Diego County district attorney's office, posing as a purchaser, developed a contact with Clarence "Pee Wee" Batchelder, a suspected dealer in various illicit drugs. Batchelder's activities indicated that his supplier was Vladimir Petroff. The agents obtained wiretap orders and monitored the telephones of both Batchelder and Petroff. The monitored conversations led the agents to believe that Frakes was a partner of Petroff, and that Abascal was active in the distribution network in Northern California.

In due course, Batchelder was arrested in the act of selling LSD, and Petroff was arrested at his house in San Diego. Frakes was arrested a short time after the arrest of Batchelder and Petroff. A quantity of evidence which is material in this appeal was seized in connection with Petroff's arrest.

Meanwhile, another team of agents in the Berkeley-East-Bay area staked out Abascal's house. A few days after Petroff and Batchelder were arrested, agents in Lafayette arrested Kathy Shull as she drove away from Abascal's house in his black Cadillac. In the Abascal Cadillac the agents found a substantial quantity of LSD marked and packaged in the same manner as that found in San Diego in the possession of Batchelder and Petroff.

## I. THE WIRETAPS

### (a) *Standing*

■ The trial, which followed lengthy pretrial proceedings, took eight weeks. Much of the government's evidence was derived from the tap on the Petroff telephone. Abascal had participated in seven of the monitored calls, and Frakes in three. All but one of these calls were referred to in the evidence. Accordingly, the appellants have standing to challenge the legality of this wiretap. *United States v. King,* 478 F.2d 494, 506 (9th Cir.), *cert. denied,* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973), and 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

### (b) *Necessity*

■ Abascal and Frakes assert that the government's applications for the wiretap did not satisfy 18 U.S.C. § 2518(1)(c).[1] The cited section emphasizes the objective of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.,* that wiretaps are "not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974); *United States v. Kahn,* 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Nevertheless, the statute is to be interpreted "in a practical and commonsense fashion." S.Rep.No.1097, 90th Cong. 2d Sess. 1968, U.S.Code Cong. & Adm.News, pp. 2112, 2190. Consequently, the government must show only that alternative means are likely, not certain, to fail; *i. e.,* a wiretap need not be resorted to only as a last resort. *United States v. Smith,* 519 F.2d 516 (9th Cir. 1975); *United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir.), *cert. denied,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975). *See also United States v. Vento,* 533 F.2d 838, 850 (3d Cir. 1976).

■ Section 2518(1)(c) requires the government to make a particularized show-

---

1. 18 U.S.C. § 2518(1)(c) specifies that each application for a wiretap must contain:

 "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

ing in each case of the improbability of success or high degree of danger from the use of alternative investigative techniques. The government must do more than merely characterize a case as a "gambling conspiracy" or a "drug conspiracy" or any other kind of case that is in general "tough to crack". *United States v. Kalustian,* 529 F.2d 585, 589 (9th Cir. 1975); *United States v. Kerrigan,* 514 F.2d at 38. *But see United States v. McCoy,* 539 F.2d 1050, 1056 (5th Cir. 1976). *Cf. United States v. Scully,* 546 F.2d 255, 260–261 (9th Cir. 1976).

■ There is, of course, little doubt of the sufficiency of the affidavits supporting the Batchelder tap. Batchelder had discovered that he was under surveillance and had turned "wary". (Batchelder was involved in a complex network of marijuana smuggling and distribution in addition to the LSD conspiracy.) Batchelder had refused to allow the undercover agent to deal directly with any of his drug sources. The agents knew from their nonelectronic investigation that wiretaps would generate significant new evidence from Batchelder, but that nothing else would be productive. On Petroff, the record was similar, but nonelectronic techniques had produced little.

■ The wiretap statute requires that § 2518(1)(c) be satisfied with regard to each separate wiretap. Thus a showing of need for the Batchelder wiretap would not necessarily justify the need for the Petroff wiretap. It is not enough that the agents believe the telephone subscribers they wish to tap are all part of one conspiracy. Less intrusive investigative procedures may succeed with one putative participant while they may not succeed with another. Here, however, we are satisfied that the supporting affidavits were sufficient to justify the Petroff tap. The government, upon discovering that Petroff was probably Batchelder's source, had undertaken an· extensive "paper" investigation of Petroff. His lengthy criminal record was soon supplemented by a mass of false personal data Petroff had given to various agencies in an apparent effort to avoid being traced. Also found were telegrams to Europe and tele-

phone toll records indicating a call to a woman in New Orleans who had a California LSD arrest record. During the investigation Batchelder had indicated both that he thought Petroff was manufacturing the drug and that it was being imported from Europe and smuggled through a bribed Customs agent. Agents were entitled to check both theories.

Professionally packaged drug containers obtained from Batchelder were circulated to a variety of law enforcement agencies, but these samples produced no new leads. Batchelder's refusal to allow the undercover agent to deal directly with Petroff made it impossible for agents to move upward from within the conspiracy. No other informants that could have been of any assistance were known. Even if Batchelder had known something about the operations beyond Petroff, the government would have jeopardized its entire investigation by pressing Batchelder for more information.

The agents had, therefore, substantial reason to believe, at the time they requested the wiretap, that Petroff was in the middle of an extensive drug conspiracy with international dimensions. It was also clear that the telephone was the principal means of communication of the conspirators. Petroff's known record and activities had shown him to be wary of surveillance and adept at avoiding it.

■ This is not a case of "boilerplate" allegations true of drug conspiracies in general and held not to be sufficient in *Kalustian.* Here; the affidavit etched the nature and contours of *this* conspiracy and the nature and extent of this investigation up to the requesting point with enough particularity to allow a judge reasonably to ascertain that continued use of ordinary surveillance probably would be fruitless. The wiretap orders were valid. *United States v. Spagnuolo,* 549 F.2d 705 (9th Cir., 1977).

### (c) *Minimization*

Claiming a systematic failure by the agents monitoring the Petroff and Batchelder wiretaps to comply with the mini-

mization requirements of 18 U.S.C. § 2518(5), Frakes and Abascal also sought total suppression of the wiretap evidence on this ground.

The government argued that these defendants had standing to challenge minimization only as to their own calls; that the monitoring agents had made a good-faith, if not completely successful, effort to limit interception; and that, assuming a failure to minimize, total suppression was not an appropriate remedy. Following a fourteen-day evidentiary hearing and the submission of briefs, the district court denied the motion to suppress. This ruling was correct.

■ On the facts of this case the agents reasonably could have recorded all the monitored calls during the twelve-day life of the wiretaps.[2] We need not, therefore, fix abstract limits of standing to complain about minimization or discuss what might be appropriate relief under 18 U.S.C. § 2518(5) if minimization were not properly carried out.

■ The standard of minimization is reasonableness. Reasonableness must be determined from the facts of each case. *United States v. Chavez,* 533 F.2d 491 (9th Cir.), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Scott,* 170 U.S.App.D.C. 158, 516 F.2d 751, 755, *cert. denied,* 425 U.S. 917, 96 S.Ct. 1519, 47 L.Ed.2d 768 (1976).

■ In assessing reasonableness in this case, it is significant that the life of the wiretaps was very brief. The officers were investigating a large-scale drug ring in which the existence but not the identity of

coconspirators was known. *See United States v. Turner,* 528 F.2d 143, 157 (9th Cir. 1975). Once a pattern of innocent calls develops, of course, those monitoring have a duty to terminate their recording of such calls. *United States v. Chavez,* 533 F.2d at 494; *United States v. Armocida,* 515 F.2d 29, 42–43 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). In this instance, however, the agents were hampered not only by the short life of the tap authority and the uncertain identities of those involved, but by the often guarded language used on the telephone.

■ The conversing conspirators frequently discussed non-narcotic-related matters at the beginnings of conversations, and often resorted to jargon and code words, a frequent practice in narcotics dealings. *United States v. Chavez,* 533 F.2d at 494; *United States v. Turner,* 528 F.2d at 157–58. Considering the totality of the circumstances, the recording of all the monitored calls in this case was not a violation of the minimization requirements.

In light of our determination that there was no failure of minimization, we need not reach the question whether the government's Manual on Electronic Surveillance was discoverable by defendants. *See United States v. King,* 335 F.Supp. 523, 541 (S.D.Cal.1971), *reversed in part on other grounds,* 478 F.2d 494 (9th Cir. 1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). The unavailability of the manual in this case could not have constituted reversible error in any event.

**2.** The government made three tapes of each conversation. The first two were sealed immediately and sent to the court and the United States Attorney's office. The government says the third tape was used to aid in the making of synopses of the calls. Each tape was allegedly used many times, thus automatically erasing the underlying recordings. Appellants assert that the third tape, unlike the "sanitized" versions, ran continuously and was never minimized. Given our holding, we need not decide the actuality or the propriety of this procedure. We note, however, that while 18 U.S.C. § 2518(8)(a) permits the making of duplicate recordings "for use or disclosure," it also dic-

tates that authorized recording "be done in such way as will protect the recording from editing or other alterations," requires that authorized recordings be made available to the judge and sealed under his directions immediately upon the expiration of the period of the order, and forbids their destruction except upon order of the court. We leave to another time the issue of whether these latter requirements apply to tapes made for use as well as for disclosure. But it should be obvious that arrangement of recorders as in this case, involving as it does the destruction of almost the entire third recording, makes difficult the enforcement of the minimization requirement.

## II. SEARCH AND SEIZURE

### (a) *Abascal's Automobile*

Agents began their surveillance of Abascal's residence on the evening of March 8, 1973. The next day, agents stopped Abascal's Cadillac with the results already noted. Abascal asserts five defects in the search of his Cadallic: (1) the search could not be sustained under 19 U.S.C. § 1595a because the officers did not have probable cause to believe that the Cadillac contained imported contraband; (2) the officers did not have probable cause to believe that the car contained LSD on March 9, 1973; (3) the search does not fit within any exception allowing warrantless searches; (4) if there was probable cause to search the car, the agents had sufficient time to secure a warrant; and (5) if probable cause did exist, it was tainted by an alleged illegal prior search.

■ We need not decide whether there was probable cause to believe that the contraband in the Cadillac was illegally imported so as to legalize warrantless seizure under 19 U.S.C. § 1595a. The search made here was proper under the moving vehicle exception. Under this exception all that is required to stop and search an automobile on the highway is probable cause to believe that it contains any type of contraband. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The search is justified by exigent circumstances because "the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained * * *." *Chambers v. Maroney,* 399 U.S. at 51, 90 S.Ct. at 1981.

■ The agents had probable cause to believe on the day of the search that the Cadillac then contained LSD. Shelly Federgreen, an acquaintance of Abascal, was contacted by agents after they found her number in Frakes' telephone notebook. In a sworn statement at her attorney's office on March 8, 1973, Federgreen said that Abascal had been at her residence on March 5, with a wine crate containing four large plastic bottles with smaller glass vials labeled "Golden Hornet". Abascal told her it was LSD worth about $15,000,000. According to Federgreen, Abascal left the LSD in her apartment overnight, returned March 6, placed the plastic containers in an orange flight bag provided by her, and, with the bag, left in his Cadillac. Federgreen gave the agents Abascal's phone number and address in Lafayette and told them he had a girl friend in Berkeley named Kathy.

Agents placed the Lafayette residence under surveillance. On the morning of March 9, a woman later identified as Kathy Shull drove, with a dog, in a Porsche automobile from Abascal's Lafayette house to the Berkeley campus. The woman left the dog tied to the Porsche, eluded surveillance by entering a classroom building, and returned to the Lafayette house in another car with her brother. The woman then backed the black Cadillac out of the garage and drove off, only to be stopped a few blocks away by other agents who had not been decoyed by her evasive conduct in Berkeley.

On March 8, the agents not only had the benefit of Shelly Federgreen's detailed and reliable statements of March 6; they also had Kathy Shull's trip to Berkeley and return to Lafayette to contemplate. The agents had abundant probable cause to believe that contraband was in the Cadillac when they stopped the car. *See United States v. Hills,* 464 F.2d 1023 (9th Cir. 1972).

■ Abascal claims that agents delayed too long their search of the car. He argues that once they had probable cause, the agents could not evade the warrant requirement by failing to obtain a warrant and simply awaiting the arrival of exigent circumstances. *But cf. Cardwell v. Lewis,* 417 U.S. 583, 595, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). It should be obvious from the facts outlined, however, that whether or not a warrant might have been issued earlier on the basis of the Federgreen statement, new probable cause clearly came into the inves-

tigation when Kathy Shull attempted to evade surveillance and flee with the Cadillac. There is no rule that officers must strike the instant they have probable cause. *See United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

■ Abascal also claims that the evidence seized from his Cadillac was tainted by the agents' alleged trespass on his residential property. He says the agents first looked through the garage window and then searched the Cadillac while it was parked in the garage during their surveillance of his residence. Whether the alleged observations and search actually took place is immaterial in this case because independent probable cause to search the moving Cadillac on March 9 came from information wholly untainted by any prior investigation of the garage. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Brandon,* 467 F.2d 1008 (9th Cir. 1972); *United States v. Bacall,* 443 F.2d 1050 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971).

There was no error with respect to the evidence against Abascal.

### (b) *Search of the Petroff Residence*

■ Frakes seeks to challenge the warrant issued for the search of the Petroff residence. Because Frakes was charged with possession of the LSD seized at the Petroff residence, he has standing to move for its suppression. *United States v. Boston,* 510 F.2d 35, 37 (9th Cir. 1974), *cert. denied,* 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975). Frakes had no standing, however, to move to suppress the other items seized from Petroff's house. Frakes was not present at the time of search, and he has asserted no possessory or proprietary interest in the residence searched or other items seized. *See Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

■ The search warrant was properly issued, worded, and executed. Insofar as it covered the subject LSD, it was sufficiently specific and the affidavit underlying the warrant provided ample probable cause. There was no error in denying Frakes' motion to suppress.

### III. EXCLUSION OF FRAKES' PROFFER AS HEARSAY

In his telephone conversations with other conspirators, Petroff frequently referred to the existence of a "compadre", a "socio", or "partner". Starting January 12, 1973, Petroff began arranging with Abascal and an as yet unidentified supplier the purchase of an illicit commodity referred to usually as an "acre". It appears from the coded language used by Abascal at one point and references to "auxiliary materials" that the substance was ergotamine tartrate, a chemical compound used in the manufacture of LSD. In conversations with Abascal and the supplier. Petroff repeatedly stressed that he must receive approval from his partner for the purchase, and in another conversation actually identified this person as "Paul".

On January 14, Petroff told Abascal that he had tried to call his partner earlier that day but could not reach him. Telephone records indicated that he had called Frakes' number that day but received no answer. Immediately after concluding his conversation with Abascal, Petroff called Frakes and told him that he "had a small decision to make." He asked him if he remembered "old Charlie", and said "old Charlie" had an "acre" for sale at twenty-five, a savings of ten. Frakes protested that "we can't afford it", but Petroff insisted that it was too good a deal to pass up. Frakes also made a reference at one point to a "business like ours", and the two discussed the problem of some unnamed others "screwing up our market." Throughout the entire conversation, Frakes expressed uneasiness about using his telephone, and finally Petroff offered to complete the discussion from pay phones. Petroff was then observed going to a nearby public phone booth and making two calls.

The January 14 telephone conversation between Frakes and Petroff was, therefore,

vital evidence. The call established Frakes' relationship with Petroff and consequently his constructive possession and distribution of the LSD found in Petroff's house and that sold by Batchelder to the undercover agent. That conversation was also the basis of the charge under 21 U.S.C. § 843(b) that Frakes knowingly and intentionally used a telephone to facilitate the commission of crime (the conspiracy). Essential to the government's case was its argument that real estate terms such as "acre" and "lot", used in that conversation as well as in other conversations between Petroff and alleged conspirators, were code words for LSD or ergotamine tartrate.

Faced with the wiretap evidence of this January 14 conversation, Frakes attempted to introduce other tape-recorded conversations from the same wiretap between Petroff and nonconspirators. The conversations offered by Frakes allegedly dealt with other business transactions. Frakes offered these conversations to rebut the government's inference that the January 14 Frakes-Petroff conversation was about LSD rather than about real estate.

The district court excluded the offered tapes of other conversations as hearsay. This was error.

■■■■■ Out-of-court statements are excludable hearsay if offered to prove the truth of the matter asserted in them. Fed. R.Evid. 801(a), (c). But the truth of any assertions in the conversations Petroff had on the telephone is immaterial to this case. Frakes did not offer the conversations to prove the truth of any assertions therein, but rather to show a pattern of Petroff's verbal behavior on the telephone that was consistent with Frakes' argument that the January 14 call was about an innocent real estate deal. Frakes had a right to argue to the jury Frakes' theory of the conversation upon which the government was building its case against Frakes.

The government's portion of the tape included words commonly used in discussing real estate transactions. The government claimed these words were code words for drug quantities and prices. Frakes claimed these words (lots, acres, and price quotations) were not code words at all, but actually were routine communications about real estate deals. Whether or not Frakes could prove it, he had the right to use any available evidence to argue to the jury that the real estate language was not code language. The rejected tapes contained references to "lots", and, it could be argued, other words capable of relating to real estate transactions, as Frakes contended. The question was one for the jury. The exclusion of the tapes offered by Frakes denied him the right to present an important part of his defense, and was prejudicial error.

Frakes' convictions on the substantive counts, including the count for misuse of the telephone, must be reversed and remanded.

## IV. SUBSTANTIAL EVIDENCE OF CONSPIRACY

The conspiracy count, however, was not affected by the erroneous exclusion of the tapes and is fully supported by other evidence.

■■■■ Coded notebooks linked Frakes and Petroff with each other and with Abascal. A list of European chemical companies which manufactured ergotamine tartrate was seized at Petroff's residence. It was in Frakes' handwriting. In a passport application Petroff listed Frakes' telephone number as his own. Frakes' telephone notebook contained the number of Shelly Federgreen, a friend of Abascal. The same number was found in Petroff's telephone notebook as a number for "Mick" (a nickname used by Abascal). When Petroff's home was searched on January 22, 1973, in addition to the list of Frakes' handwriting agents also found a coded notebook which, when deciphered, was found to contain Frakes' telephone number.

Excluding the actual content of the January 14 call, the events preceding it provide additional links between Frakes and the conspiracy. Following the call, moreover, Petroff flew from San Diego to meet with

Abascal at a restaurant in Los Angeles and, after leaving the restaurant, took a taxicab to Frakes' house where Petroff spent two hours. There is no way the excluded evidence could have helped Frakes rebut the conspiracy case.

## V. REFUSAL TO GIVE INSTRUCTIONS

■ The court refused three of Abascal's requested instructions and one requested by Frakes. None of these points requires extensive discussion. In Abascal's case, the instructions given were better than those requested. In Frakes' case, another trial, if there is one, will call for new instructions in light of the evidence then before the court.

## VI. EXCLUSION OF ABASCAL'S EVIDENCE ON COLLATERAL MATTERS

■ Abascal assigns error to the court's refusal to permit him to call witnesses to impeach the surveillance team as to testimony given at the suppression hearing with reference to the evidence seized from Abascal's Cadillac and to produce and conduct an experiment on the car. All this evidence, if material, should have been offered in the suppression hearing. When offered at the trial, in an attempt to impeach the government agents, it was merely impeachment on collateral matters. *Lenske v. Knutsen*, 410 F.2d 583, 585 (9th Cir. 1969). A trial judge has wide discretion in dealing with such impeachment. *Ramirez v. United States*, 294 F.2d 277, 282 (9th Cir. 1961); *Gage v. United States*, 167 F.2d 122, 125 (9th Cir. 1948).

There was no error here in dealing with the offered evidence.

## VII. PROSECUTORIAL MISCONDUCT

■ Defendants allege prosecutorial misconduct in delayed surrender of government evidence to the defense. Even if there was prosecutorial foot-dragging in turning over evidence, Abascal and Frakes have shown no prejudice. *United States v.*

*Baxter*, 492 F.2d 150 (9th Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Banks*, 383 F.Supp. 389 (D.S.D.1974), *appeal dismissed, sub nom. United States v. Means*, 513 F.2d 1329 (8th Cir. 1975).

With respect to fingerprint evidence, Abascal alleges that the government (1) failed to obey discovery orders, and (2) manufactured the evidence admitted at trial. The fingerprints in question are those taken from the plastic bags and bottles found in the Cadillac.

The court ordered the prosecution to turn over all fingerprints and to make any fingerprint lifts in its possession available for microscopic examination. The government obtained both photographs and lifts of the prints. The photographs were shown to Abascal on August 3, 1973, the date ordered by the court, and were eventually admitted as evidence at trial. The government disclosed the content of the report on the lifts. The lifts and report were lost and never introduced as evidence. Discovery orders on the fingerprints were followed.

The alleged fabrication occurred on August 3, 1973, the date evidence was made available for defendant's examination. Abascal now says he handled the objects at that time and created the prints that were admitted at trial.

■ The jury heard testimony on both sides concerning fabrication. This was evidence to be weighed by the jury in reaching their verdict. It is not within our province to reweigh these facts. *A. & G. Stevedores v. Ellerman Lines*, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).

## VIII. AMENDMENT OF THE INDICTMENT

Both defendants complain about the district court's "amendment" of their indictment on the conspiracy charge. The indictment alleged:

"[Defendants] did knowingly and intentionally combine, conspire and agree together and with each other * * * to knowingly and intentionally import, dis-

tribute and possess with intent to distribute LSD * * *."

At a pretrial hearing upon a motion, an alleged coconspirator, Demiraiakian, complained about the vagueness of the indictment. At that hearing, the trial court noted that the conspiracy alleged in the conjunctive three illegal acts or goals. The court, without researching the issue, verbalized the theory that proper pleading should have broken up the conspiracy count into three different counts, but that since the government pleaded it in one count the court would require for conviction proof of all three elements: importation, possession, and distribution.

 This theory was incorrect. The government may charge in the conjunctive form that which the statutes denounce disjunctively, and evidence supporting any one of the charges will support a guilty verdict. *United States v. Hobson,* 519 F.2d 765 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975); *McGriff v. United States,* 408 F.2d 333, 334 (9th Cir. 1969). Further, while the law of conspiracy does not allow a single conspiracy which violates several laws to be charged as multiple conspiracies (*United States v. Basurto,* 497 F.2d 781, 791 (9th Cir. 1974); *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942)), the government may allege a single conspiracy in several counts to meet the uncertainties of the evidence (*United States v. McKnight,* 253 F.2d 817 (2d Cir. 1958); *United States v. Maryland State Licensed Beverage Association, Inc.,* 240 F.2d 420 (4th Cir. 1957)). The district court should not have indicated preliminarily that the government had to prove all three of the objects of the conspiracy in the conjunctive.

 At the close of the government's case, defendants made a motion for a judgment of acquittal on the grounds of a failure to prove importation. The district court agreed that there was no evidence of importation, but simply struck the word "import" from the face of the indictment. This act, in effect, reversed the court's earlier opinion that the government had to prove all the elements, in the conjunctive. While awkward, the court's action did not create a reversible error.

Both defendants assert that the alteration of the indictment by excising the word "import" from the conspiracy count violated the principle first enunciated in *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), that a trial court may never alter or amend an indictment. *See also United States v. Hobson, supra;* *United States v. Dawson,* 516 F.2d 796, 800 (9th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975).

 The Supreme Court, however, no longer adheres to the absolute letter of the *Bain* rule (*Salinger v. United States,* 272 U.S. 542, 548–549, 47 S.Ct. 173, 71 L.Ed. 398 (1926)), and *Bain* has been limited to its facts (*Salinger v. United States,* 272 U.S. at 549, 47 S.Ct. 173; *United States v. Hobson,* 519 F.2d at 774). The current view of "amending" an indictment is that matters of form and surplusage may be "read out" of the indictment by instruction to the jury if the defendant is not prejudiced thereby. *See, e. g., United States v. Edwards,* 465 F.2d 943 (9th Cir. 1972); *Heisler v. United States,* 394 F.2d 692 (9th Cir.), *cert. denied,* 393 U.S. 986, 89 S.Ct. 463, 21 L.Ed.2d 448 (1968).

The instant case differs from *Edwards* and *Heisler* in that the alteration here was physically made on the face of the indictment. It seems anomalous, however, to allow a trial judge to water down an indictment by instructing the jury to disregard one of its allegations, yet to forbid any physical alteration on the face of the indictment. This elevation of form over substance is wholly inconsistent with modern criminal pleading. *See* Fed.R.Crim.P. 2; 1 C. Wright & A. Miller, Federal Practice & Procedure §§ 31–32 (1969). We doubt that *Bain* has continuing validity in forbidding the physical striking of material that is patently surplusage.

As noted above, there was no need for the government to prove all three elements in the conjunctive. Accordingly, the term

"import" was indeed surplusage. Defendants claim, however, that the judge's earlier statement was a ruling which made proof of that element mandatory for this case and, further, that they relied on that ruling to their detriment, orienting their defense entirely to defeating the importation count.

This argument, by these defendants, has a hollow ring. The trial judge's initial ruling simply did not apply to their cases. The motion to clarify the indictment was made only by Demiraiakian. Neither of these appellants joined the motion. Their present effort to capitalize on it is clearly an afterthought.

Eleven defendants and their attorneys presented literally dozens of pretrial motions to the trial judge. The interests of the various alleged coconspirators were not necessarily congruent. The judge insisted upon dealing with each defendant's motions in turn and passing upon each motion of each defendant to avoid confusion and misinterpretation. Even though most of the motions were repetitive, virtually identical demands for discovery orders, the judge stated on each motion that his ruling applied only to the particular defendant then before him and would apply to any others only if they specifically and explicitly made a request to join in that particular motion.

Moreover, it is highly unlikely that the defendants were in fact prejudiced by the Demiraiakian ruling. They were aware, of course, that the judge's "ruling" applied only to Demiraiakian, was given "off the cuff" and was over a year old by the time of the trial. There was ample opportunity for the defense to secure a good working knowledge of the contours of the government's case and prepare an adequate defense to all the elements of the conspiracy charge. Those who have read thus far will have noted that the defense was thorough and that no possible point was left untouched.

## IX. PREJUDICIAL PUBLICITY DURING THE TRIAL

■ Defendants also allege error in the refusal of the trial judge to inquire of the jury as to its exposure, if any, to six newspaper articles which appeared during the two-month trial. The trial judge, of course, has the duty to detect any contaminating influences on the jurors' deliberations and take appropriate steps to rectify improprieties. *United States v. Polizzi*, 500 F.2d 856, 880–881 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). *See Silverthorne v. United States*, 400 F.2d 627, 643 (9th Cir. 1968), *appeal after remand*, 430 F.2d 675 (1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971).

■ Here the trial judge refused to interrogate the jurors because he found that the articles were not prejudicial. Two of the articles appeared on September 6, 1974. One concerned the denial of a recusal motion and the other reported the selection of the jury. Two more appeared on October 2, 1974. The first discussed a motion to hold a witness in contempt for his alleged failure to testify truthfully during the pretrial motions. The other concerned the general problem of a faulty wiretap authorization scheme instituted by the then Attorney General. Finally, two more articles appeared on October 9, 1974. Both announced the hitherto secret indictment of Michael Green, an alleged associate of the defendants in the LSD venture, on the occasion of his plea of innocent.

The articles were, for the most part, short, routine, factual descriptions of court proceedings, appearing in the middle and back pages of the newspapers. Two of the articles contained only tangential reference to the case and one of them was related to but one issue in this case and only in the most abstract fashion. Only the claim that this was "the largest LSD seizure ever made in this country" (also phrased as "the largest LSD case ever prosecuted in this country"), which was made in both of the September 6 articles and the October 2 contempt article, was arguably incorrect and arguably prejudicial. This does not qualify as material which is either "spectacular or inflammatory," *Gawne v. United States*, 409 F.2d 1399, 1401 (9th Cir. 1969), *cert.*

*denied,* 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970) (pretrial publicity).

It is also true that the contents of most of the news items would have been irrelevant at trial and that there have been occasions where exposure of jurors to such evidence has been found prejudicial. *See, e. g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Pomponio,* 517 F.2d 460 (4th Cir.), *cert. denied,,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). If any of the information in these articles was inadmissible however, it was not because of possible prejudice but because of simple lack of relevancy. We cannot say that the trial judge abused his discretion. There was no prejudice, and no basis for a new trial.

## X. CONCLUSION

The judgment against Abascal is affirmed. The judgment against Frakes on the conspiracy count is affirmed. The judgment against Frakes on the substantive counts is reversed and remanded.

## ORDER

On petition for rehearing, Abascal claims that he is entitled to the same relief granted Frakes because of the trial court's error in excluding the portions of the tapes the government succeeded in keeping out after playing the parts the government wanted the jury to hear. While Abascal did not raise the point in his voluminous brief, and thus technically did not bring it before us on his appeal, he did object at the time of the trial court's ruling. The exclusion of the defense evidence, however, did not affect Abascal as much as it affected Frakes.

Abascal did indeed use code words in his calls to Petroff. But the frequency, pattern, and content of the calls and their direct and obvious relationship to other overt acts undertaken on behalf of the conspiracy drastically reduced the significance of that fact as part of the government's case. We are satisfied that, given the limited evidentiary purpose of these tapes, their exclusion did not substantially prejudice the fairness of Abascal's trial. *United States v. Puchi,* 441 F.2d 697, 702 (9th Cir.), *cert. denied,* 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971).

The other points urged in the appellants' petitions for rehearing present nothing new and no basis for further modification of our judgment. The panel has voted to deny the petitions for rehearing and to reject the suggestions for rehearing en banc. The full court has been advised of the suggestions for rehearing en banc, and no judge of the court has requested en banc consideration.

Abascal's petition for rehearing with suggestion for rehearing en banc, filed March 31, 1977, and Frakes' petition for rehearing with suggestion for rehearing en banc, filed April 7, 1977, are both denied as to the petitions for rehearing and rejected as to the suggestions for rehearing en banc.