UNITED STATES of America, Plaintiff–Appellee,

v.

**Michael Robert LAYKIN, Defendant–Appellant.**

UNITED STATES of America, Plaintiff–Appellee,

v.

**Dennis Lee CRAIN, Defendant–Appellant.**

Nos. 88–1326, 88–1327.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 29, 1989.

Decided Sept. 26, 1989.

---

Robert C. Moest, Los Angeles, Cal., for defendant-appellant Laykin.

James E. Guesman, Las Vegas, Nev., for defendant-appellant Crain.

Paul Ernest Wommer, Las Vegas, Nev., for plaintiff-appellee.

Before TANG, REINHARDT and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

Michael Laykin and Dennis Crain appeal from their convictions following a jury trial on one count of equity skimming in violation of 12 U.S.C. § 1709–2 (1980), and one count of conspiracy to commit equity skimming. We affirm.

## STATEMENT OF FACTS

The T.L. Corporation was incorporated on June 28, 1985. Robert Terry was the principal incorporator and the "T" in T.L. Corporation; Laykin was the president, secretary and treasurer of the company and the "L". In the summer following the incorporation of T.L. Corporation, the company began to seek and acquire single-family homes in the Las Vegas area. Using the Century 21 office owned by Robert Terry and the services of Crain, an independent agent operating from the office, T.L. Corporation purchased over 100 homes. Crain was the principal agent for identifying properties for purchase and Laykin negotiated most of the purchases.

T.L. Corporation utilized essentially the same technique for effecting each purchase. In general, it bought homes with existing mortgages and simply agreed to make the payments. If the seller had any equity in the property, the corporation would give him a note for the amount of the equity, secured by a deed of trust. The note provided for monthly interest payments and a balloon payment of the capital at the end of a term of years. To this point, there was nothing particularly unique about the purchase method. However, the purchases were negotiated through an unusual escrow account arrangement which precluded the giving of notification to the mortgage lenders that the properties were being sold or that T.L. Corporation had purchased them.

After T.L. Corporation purchased a property, Laykin arranged for Century 21 to manage it. Century 21 collected the rents and deducted both a 10% fee and the funds necessary to maintain a reasonable upkeep of the property. However, Century 21 was not permitted to pay the mortgage. It was required to turn over the remaining funds to T.L. Corporation or to Laykin personally. Whatever purpose the funds were put to, it is abundantly clear that they were not used to pay off the existing mortgage.

Beginning as early as August, 1985, the former homeowners began to call the rental office, complaining that they were receiving notices from their mortgage lenders that payment had not been made on their mortgages. Because T.L. Corporation never assumed any of the mortgages, the lenders informed the former owners that they were still liable on those debts. Century 21 told Laykin of the complaints. Nevertheless, neither Laykin nor T.L. Corporation made the mortgage payments. Because of all of the complaints, Century 21 refused to manage T.L. Corporation's properties after October 1985.

Crain then located another rental agent, the PM Corporation, to manage the properties. However, PM Corporation operated under somewhat different instructions than did Century 21. Instead of remitting the excess rental payments directly to Laykin, PM Corporation deposited the money into its own trust account. Subsequently, Laykin would instruct the rental agents to send funds to various travel agents, accountants, and lawyers, among others. Laykin also instructed the rental agents to write a large number of checks directly to him or to companies he controlled. These checks totalled approximately $9000. Laykin also directed that four checks totalling $2,000 be issued to Crain.

Soon, however, PM Corporation began to receive the same complaints about nonpayment of mortgages as did Century 21 and eventually resigned as the rental agent. By the winter of 1985, most of the homes owned by T.L. Corporation were in foreclosure proceedings. The six properties named in the indictment had mortgages that were either issued or guaranteed by either the Veterans Administration (VA) or the Federal Housing Administration

(FHA).[1] The mortgages on these six properties eventually went into default and then foreclosure, resulting in a loss of over $100,000 to the government.

On January 21, 1987, Laykin and Crain were each indicted and charged with one count of equity skimming in violation of 12 U.S.C. § 1709–2 (1980), and one count of conspiracy to commit equity skimming.[2] Equity skimming is defined as the practice of purchasing one-to-four family dwellings subject to a loan insured by either the FHA or the VA and applying the rent receipts for personal gain rather than towards payment of the mortgages. *See* H.Rep. No. 91–1556, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Cong. & Admin. News 5582, 5650.

At trial, the government argued that the foreclosures were the planned result of a scheme to skim off the profits of the housing venture and avoid payment of the mortgages in violation of Section 1709–2. The defendants contended that the losses were the unfortunate result of erroneous predictions about the Las Vegas housing market. The jury chose to believe the government and convicted the defendants on both counts of the indictment. Laykin was sentenced to five years in prison, with a substantial portion of the sentence suspended on the condition that he serve six months in jail and perform three hundred hours of community service. Crain was likewise sentenced to five years imprisonment with his sentence suspended on the condition that he serve ninety days in jail and perform two hundred and fifty hours of community service. Appellants were also jointly ordered to pay restitution of approximately $97,000 to the VA and the FHA. This appeal followed.[3]

## ANALYSIS

### I

As an initial matter, Laykin argues that the indictment charging him with equi-ty skimming is fatally defective because it does not affirmatively allege that he knew or should have known that the properties were insured by FHA or the VA and that he acted with the intent to defraud those insurers. He also contends that the jury instructions given by the district court were defective for the same reason.

12 U.S.C. § 1709–2 provides, in pertinent part, that

Whoever, with intent to defraud, willfully engages in a pattern or practice of—

(1) purchasing one- to four-family dwellings ... secured by a mortgage or deed of trust insured or held by the Secretary of Housing and Urban Development or guaranteed by the Veterans' Administration, or the loan is made by the Veterans' Administration,

(2) failing to make payments under the mortgage or deed of trust as the payments become due, regardless of whether the purchaser is obligated on the loan, and

(3) applying or authorizing the application of rents from such dwellings for his own use ... shall be fined not more that $5,000 or imprisoned not more than three years, or both.

Laykin argues that the statute is ambiguous as to whether an individual charged with a violation must know that a federal agency is the insurer and must intend to defraud that federal agency. Therefore, he argues, the rule of lenity is applicable and the statute must be construed in favor of the defendant. In *United States v. Capano*, 786 F.2d 122 (3d Cir.1986), the Third Circuit construed the equity skimming provisions of 12 U.S.C. § 1715z–4(b), which prohibits equity skimming from federally assisted multiple family housing projects. The court concluded that the language of the statute was ambiguous as to whether a

---

**1.** Contrary to the government's assertion at oral argument, the record does not indicate whether any of the other properties purchased by T.L. Corporation had mortgages that were either insured or issued by one of these government agencies.

**2.** T.L. Corporation was also indicted on these same two counts, but was eventually dismissed as a defendant.

**3.** Laykin and Crain are free on bail pending appeal.

violation could occur if the debtor had not received an extension of time in which to cure any default or obtain a modification of the mortgage terms. After examining the structure of the statute, as well as its legislative history, the court determined that the statute did not apply if the debtor had not received the extension. *Id.* at 125–27. Although the court could have ended its inquiry at this point and based its decision simply on general principles of statutory interpretation, the court bolstered its conclusion by looking to the rule of lenity. "It is well-settled that where a court's interpretative effort fails to eliminate ambiguity in the meaning of a criminal statute, [and this statute is at best ambiguous], the residual uncertainty will be resolved in favor of lenity." *Id.* at 128.

On the other hand, in *United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), the Supreme Court held the rule of lenity inapplicable when interpreting a statute it found to be unambiguous. The Court was construing the Federal False Statements Act, 18 U.S.C. § 1001, which provides in pertinent part:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations ... shall be fined...." The Court held that the statutory language did not require any specific knowledge on the part of the defendant that his statements were made in a matter within the jurisdiction of a federal agency. 468 U.S. at 75, 104 S.Ct. at 2942–43. In reaching its conclusion, the Court first considered the language of the statute and its structure and decided that the statute "unambiguously dispenses with any requirement that the Government ... prove that [the false] statements were made with actual knowledge of federal agency jurisdiction." *Id.* at 69–70, 104 S.Ct. at 2940. Because the statute was not ambiguous, the Court refused to apply the rule of lenity. *Id.* at 70 n. 7, 104 S.Ct. at 2940 n. 7.

As *Yermian* and *Capano* demonstrate, a court is not, as Laykin contends, always required to use the rule of lenity when interpreting a criminal statute. To put it simply, the rule does not apply when the statute is unambiguous. *See Lewis v. United States*, 445 U.S. 55, 65, 100 S.Ct. 915, 920–21, 63 L.Ed.2d 198 (1980). The rule of lenity is not to be used to defeat Congress' intent in creating a federal crime. *Capano*, 786 F.2d at 128 (citing *United States v. Turkette*, 452 U.S. 576, 586–87 & n. 10, 101 S.Ct. 2524, 2530–31 & n. 10, 69 L.Ed.2d 246 (1981)). Accordingly, our task is to examine the statute to determine whether it is in fact ambiguous.

Although neither the appellant nor the government has engaged in close analysis of the language of Section 1709–2, we conclude that the statute unambiguously makes the commission of the act of equity skimming a crime regardless of the defendant's knowledge, or lack of knowledge, that the mortgages on the properties involved are insured by the VA or FHA. On its face, the statute does not require such knowledge; and there appears to be no reason that it should. The requirement in Section 1709–2 that the properties be insured by a government agency plays the same role as does the requirement in the Federal False Statement Act that the statement be made in a matter within the jurisdiction of a United States department or agency: it establishes federal jurisdiction. "Its primary purpose is to identify the factor that makes [equity skimming] an appropriate subject for federal concern." *Yermian*, 468 U.S. at 68, 104 S.Ct. at 2939; *see also United States v. Feola*, 420 U.S. 671, 676–77 & n. 9, 95 S.Ct. 1255, 1259–60 & n. 9, 43 L.Ed.2d 541 (1975) (no requirement in 18 U.S.C. § 111, which prohibits assaults on federal officers, that defendant know that individual is a federal officer; requirement is jurisdictional); *United States v. Brown*, 616 F.2d 844, 845–46 (5th Cir.1980) (requirement in 18 U.S.C. § 2113 that bank be federally insured or chartered is jurisdictional). Because the statutory language at issue is jurisdictional, scienter

is not required.[4] "Jurisdictional language need not contain the same culpability requirement as other elements of the offense. Indeed, we have held that 'the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.'" *Yermian,* 468 U.S. at 68–69, 104 S.Ct. at 2939 (quoting *United States v. Feola,* 420 U.S. 671, 676–77 n. 9, 95 S.Ct. at 1260 n. 9 (1975)).[5]

The structure of the statute plays a part in our conclusion that the knowledge requirement of 12 U.S.C. § 1709–2 does not apply to the federal insurance aspect of the offense. The two phrases connoting knowledge, intent and willfulness, are set off from the language that provides the loans be made, guaranteed or held by a federal agency. The phrase "intent to defraud" is set off in a separate clause from the rest of the language. Its isolation suggests that Congress intended only for a specific intent to defraud, not for a specific intent to defraud an agency of the United States government. Moreover, the term "willfully" is part of a disjunctive sentence. The natural reading of the sentence is that the defendant must willfully participate in a pattern of purchasing one- to four-family dwellings *and,* in addition, that the houses must be insured by the federal government. The final clause is a separate component not modified by a knowledge requirement. *See Yermian,* 468 U.S. at 69, 104 S.Ct. at 2939–40.

Because we find no ambiguity in the statute, we conclude that the rule of lenity is inapplicable. We hold that the language of 12 U.S.C. § 1709–2 does not require that a defendant know (or should know) that properties are insured by the FHA or the VA; nor does it require that he act with the intent to defraud those federal insurers. Thus, we reject Laykin's contention that the indictment and the jury instructions were defective because they did not include these requirements.

## II

Laykin and Crain make numerous challenges to the sufficiency of the evidence adduced at trial. As always, we review such challenges to see whether, viewing the evidence in the light most favorable to the government, the jury could reasonably have found the essential elements of the crime beyond a reasonable doubt. *United States v. Fleishman,* 684 F.2d 1329, 1340 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). All reasonable inferences must be drawn in favor of the government and any conflicts in the evidence must be resolved in favor of the jury's decision. *Id.*

Both Laykin and Crain contend that there was insufficient evidence presented at trial for the jury to conclude beyond a reasonable doubt that either had the specific intent to defraud.[6] Consequently, they contend that the trial court erred in denying their motions for acquittal pursuant to Federal Rule of Criminal Procedure 29.

**4.** Of course, we do not mean to intimate that Congress could not have made the requirement that the properties be federally insured a substantive part of the offense. *See Feola,* 420 U.S. at 677 n. 9, 95 S.Ct. at 1259–60 n. 9. It could have done so by ending the statute in such a way that knowledge of the federal insurance was required. In that case, the defendant would have to know that the properties were federally insured in order for there to be a violation of the statute. But, as our analysis indicates, that is not the statute that Congress has enacted.

**5.** The fact that the federal insurance requirement is jurisdictional distinguishes our case from *United States v. Nofziger,* 878 F.2d 442 (D.C.Cir.1989). In that case, the court con-

sidered subsection 207(c) of the Ethics in Government Act, 18 U.S.C. § 207(c). The question in that case was whether the modifying term "knowingly" applied to both the "appearance clause" and "communication clause" of the sentence of which it was a part, or whether it applied only to the first clause. 878 F.2d at 444. After finding the statute to be ambiguous, the court concluded that it applied to both clauses. *Id.* 878 F.2d at 454. This conclusion was based in no small part on the fact that both clauses were substantive offenses. *Id.* 878 F.2d at 452–54.

**6.** This claim is different than Laykin's argument that intent to defraud the government is an element of the substantive offense. That theory is analyzed in part I, *supra.*

■ We believe that the government presented more than enough evidence from which a reasonable jury could conclude that Laykin and Crain each had the specific intent to defraud. It is axiomatic that intent can be inferred from conduct. *United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1978). Here, several witnesses testified to the active involvement of both appellants in purchasing the properties.[7] While, as Crain contends, negotiating the purchase of property alone is not particularly probative of an intent to defraud, both Laykin and Crain negotiated the particular parts of the deal—including the special escrow instructions—which permitted the defendants to skim off the rental payments. Both were involved in coordinating the signing of the blind escrow accounts which were crucial to the success of the scheme. The jury could probably have inferred intent to defraud from this highly unusual practice alone.

The government, however, presented much additional evidence which strengthened the inference of an intent to defraud. Once the former property owners began to complain to the rental agent that mortgage payments were not being made, Laykin assured the rental agent that they would be. When an escrow officer began to warn potential customers of the hazards involved with the type of deal that Laykin and Crain were arranging, Crain, apparently at the direction of Laykin, threatened her and ordered her to cease disclosing the nature of the transactions. The appellants' specific involvement in the organization of the transactions—especially the escrow accounts, the threats to the escrow officer by Crain, and Laykin's unfulfilled promises that the mortgage payments would be made—lay a sufficient foundation from which the jury could reasonably infer the requisite intent.

■ Crain contends that there was insufficient evidence from which the jury could conclude that he had entered into and knowingly participated in a conspiracy to engage in equity skimming. That contention is without merit. The government presented ample evidence that there was a conspiracy. The testimony of the Century 21 office manager established that Terry, Laykin, and Crain agreed that a special telephone line at Century 21's office would be for the sole use of T.L. Corporation in acquiring residential property in Las Vegas. Crain was in charge of screening all calls on that line. From this, the use of the unusual escrow instructions which prevented the VA and FHA from learning of the sales of the properties, and the lack of any effort to fulfill the mortgage agreements, a jury could rightfully infer the existence of a conspiracy to engage in equity skimming.

"Once the government has established that a conspiracy exists, 'evidence of only a slight connection [with the conspiracy] is necessary to convict a defendant of knowing participation in it.'" *United States v. Arbelaez,* 719 F.2d 1453, 1458 (9th Cir. 1983) (quoting *United States v. Kenny,* 645 F.2d 1323, 1335 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). Here, Crain's intimate participation in the details of the activity affords a reasonable basis for the jury's conclusion that he was a knowing participant.[8]

Next, both Laykin and Crain argue that there was insufficient evidence to prove that they were engaged in a pattern or practice of purchasing federally-insured homes and applying or authorizing the use of the rental payments for their own benefit, as required by the statute. This argument has two parts. First, the appellants assert that the government failed to establish that any of the funds they received had

---

7. While Laykin negotiated the purchase of most of the properties acquired by T.L. Corporation, at least two individual homeowners testified that Crain negotiated the sale of their homes.

8. It is clear that a defendant need not participate in all parts of the conspiracy in order to be

a part of it. *United States v. Taylor,* 802 F.2d 1108 (9th Cir.1986). Consequently, the fact that Crain did not direct the disbursal of funds does not preclude the jury's verdict on the conspiracy charge.

in fact been "skimmed" from the rental payments on the six properties specified in the indictment. Second, they contend that the government failed to show that any of those funds, if skimmed, were applied to their personal use.

◼ To determine the answer to the appellants' first contention, we must look to the source of the funds issued to them by the rental management companies. The government in its brief has not identified any funds that were issued to Laykin or Crain while Century 21 was managing T.L. Corporation's properties. Rather, it points to evidence that, while PM Management was managing T.L. Corporation's extensive property holdings, PM Management issued checks in the amount of approximately $9000 to Laykin, while Crain received four checks in the total amount of $2000. In addition, the government also presented evidence that Laykin directed PM Corporation to issue checks to numerous other entities.

The problem in determining whether the monies paid to Laykin and Crain were in fact skimmed in violation of the provisions of the Act arises from the fact that the rental payments from the six federally-insured properties specified in the indictment were commingled with rental payments from T.L. Corporation's other property holdings, approximately 100 in number. The government's assertion at oral argument notwithstanding, the record does not indicate whether any of the other properties were also federally-insured. Thus, while it is clear that the trust account from which the checks to Laykin and Crain were issued contained tainted, i.e., skimmed, funds, it is also clear on this record that most of the funds in the account were untainted.

However, we do not think the gap in the record renders the convictions invalid. Generally, when tainted and untainted funds are commingled in an account, and withdrawals are subsequently made, a proportionate share of those withdrawals will be allocated to the tainted funds.[9] *See* Restatement (Second) of Trusts § 202(1), comment i (1959) (commingling by trustee of trust and personal funds); *see generally United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159–60 (2d Cir.1986) (tracing proceeds from narcotics transactions). Because of Section 1709–2, Laykin and Crain were essentially trustees of the rental payments from the properties set forth in the indictment. We believe that the Restatement allocation rule is an appropriate one to apply here. Accordingly, from the evidence presented by the government, the jury could reasonably conclude that at least part of the monies the appellants received from the commingled account came from the rental payments on the federally-insured properties.

◼ The second part of the appellants' argument is that the government failed to establish that either of them ever used any of the skimmed funds for his own personal purposes. Laykin argues that the government never rebutted his claim that the funds he received were to reimburse him for business expenses incurred when flying from Beverly Hills to Las Vegas to complete the escrow agreements; Crain argues simply that the government never showed what he did with the funds he received. It is true that the government was unable to trace what happened to the funds after the rental agent presented the checks to Laykin or his agents, or to Crain. However, given the fungibility of money, which makes tracing of the use of specific funds difficult, if not impossible, and far more important, given the fact that no evidence was offered that any restrictions were placed on the defendant's use of funds that they personally received, we believe that the jury could reasonably infer from the record before it—including of course the fact that the funds were not used to pay any of the mortgages—that Laykin and Crain received the money for their own personal use. That, in our view, is suffi-

9. The share is established by determining the ratio of the tainted funds to the untainted funds in the account.

cient to support a violation of § 1709–2.[10] We do not mean to suggest that the jury could have drawn no other inference from the evidence. Rather, we hold that, given our deferential standard of review, we cannot say that the jury could not have reached the conclusion it did.

## III

■ Laykin argues that the indictment in which he was charged is fatally defective because it is imprecise as to the time of the conspiracy. The indictment reads, "Beginning on a date unknown to the Grand Jury, but not later than on or about March 1, 1985, and continuously thereafter and including on or about October 14, 1986...." Relying on *United States v. Cecil*, 608 F.2d 1294, 1296–97 (9th Cir.1979), Laykin argues that the use of "on or before" to set the time limit of the conspiracy is sufficiently vague to render the indictment invalid. The government argues in rebuttal that any error in the indictment is irrelevant because time is not a material element of either the conspiracy or equity skimming charges. Thus, the government argues, any variance between the indictment and the proof at trial cannot constitute reversible error. *See United States v. Davis*, 679 F.2d 845 (11th Cir.1982).

The common thread which connects *Cecil* and *Davis* is that the indictment must sufficiently notify the defendant of the charges against him and enable him to prepare a defense. "[A]n indictment must furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defenses, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge." *Cecil*, 608 F.2d at 1296. Appellant is correct in noting that the dates specified in the indictment here do not give an adequate basis for ascertaining the charges against

him; as in *Cecil*, the language of the indictment is open-ended in both directions. The beginning date tells the defendants nothing—just that the conspiracy started at some time before a particular date. The ending date is in all likelihood just inartfully stated: "*including* on or about October 14, 1986" (emphasis added) was undoubtedly intended to refer to the closing date. Unfortunately, as presented, the indictment merely states that the conspiracy did not end prior to October 14, 1986. However, unlike *Cecil*, the overt acts alleged in the indictment before us provide a narrowing focus. The indictment contains a list of 18 overt acts that serve as a basis for limiting the time frame covered by the indictment and giving the defendants notice of the scope of the charges against them. The acts occurred in a discrete time period between January 15, 1985 and July 14, 1986 and provide sufficient information for the defendant to prepare an adequate defense. Accordingly, we conclude that the uncertainty regarding beginning and ending dates does not render the indictment fatally defective.

## IV

■ Laykin also argues that the government did not introduce sufficient evidence to support a finding beyond a reasonable doubt that a conspiracy existed on or about March 1, 1985. He contends that the earliest date that can be derived from the evidence adduced at trial is June 28, the date of the incorporation of T.L. Corporation. Laykin argues that any conspiracy to violate Section 1709–2 could not have been formulated until July because he was originally interested in purchasing only large apartment complexes, not one- to four-family dwellings as required by the statute.

In response, the government advances two arguments. We need only address one of them. The government argues that because time is not a material element of the conspiracy, any variance in the proof adduced at trial with respect to the starting date of the conspiracy that is within the

---

**10.** For present purposes, we can ignore the fact that some of the funds were paid to companies controlled by Laykin rather than to Laykin personally and look just to the funds falling into the latter category. We doubt, however, that the result would be different were we required to consider the former category of payments as well.

confines of the due process clause [11] does not constitute reversible error. We agree. Rule 52(a) of the Federal Rules of Criminal Procedure states that any variance that does not affect substantial rights should be disregarded by the court. Time is a material element of an offense only if made so by statute. *See, e.g., United States v. DeBrouse,* 652 F.2d 383, 391 (4th Cir.1981). Here, because the statute does not make time a material element, the variance between proof and indictment is irrelevant so long as the defendants were afforded adequate notice of the charges against them. As we have already discussed, the indictment was adequate for that purpose. Accordingly, we hold that the variance between the indictment and the proof adduced at trial with regard to the beginning date of the conspiracy is immaterial.

## V

■ Laykin further argues that the district court erred in admitting evidence of another equity skimming conspiracy. Prior to and contemporaneous with the conspiracy alleged in the grand jury indictment, another group in Las Vegas, the B & G Corporation, was engaged in a similar equity skimming operation in violation of Section 1709–2. Although the B & G Corporation conspiracy was separate from the one at issue in this case, the operations of B & G Corporation and T.L. Corporation were linked in a very limited manner: two of the six houses specified in the indictment were purchased by T.L. Corporation from B & G Corporation.[12]

The main figures in the B & G Corporation conspiracy were Robert Leven and Glenn Goodale. Indictments were returned against them on January 21, 1987.[13] Goodale and Leven eventually pleaded guilty to those charges and then appeared as government witnesses in this case. They testified to a wide range of issues, many extending beyond the limited confines of

this case. For example, Goodale and Leven both extensively described the nature of the B & G Corporation operation and their method for skimming equity.

The government contends that the admission of this evidence was proper. It relies on *United States v. L'Hoste,* 609 F.2d 796 (5th Cir.1980), to argue that proof of multiple conspiracies does not constitute a fatal variance from the indictment. *See also Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). However, these cases are not on point. They merely define the rules for determining when proof of multiple interlinked conspiracies violates the substantial rights of a defendant charged with only a single conspiracy. Here, there were no interlinked conspiracies. The two conspiracies were "related" only in the very limited sense that there was an occasional business transaction between them; there certainly was no common actor or plan between them. Because the B & G Corporation conspiracy was substantially unrelated to the conspiracy alleged in the indictment in this case, the question is not one of variance and proof, but of relevancy. More specifically, the question is whether the admission of significant details of the Goodale and Leven conspiracy prejudiced the defendants and confused the jurors.

It is clear that the details about the B & G Corporation conspiracy were largely irrelevant to the government's case, and the substantial similarities between the dates and activities of the two equity skimming conspiracies and the type of equity skimming taking place raise a strong possibility that the jurors would confuse the conspiracies and infer the guilt of the defendants from the pleas of the B & G Corporation defendants. However, the vast majority of the evidence which Laykin now complains of was admitted at trial without objection by defense counsel. Indeed, much of the evidence to which Laykin did ultimately

---

**11.** *See supra* § III.

**12.** T.L. Corporation purchased a total of 38 houses from B & G Corporation.

**13.** Not coincidently, indictments were handed down in this case on the same day. Laykin suggests that the indictments in this case are

tainted because of the confusing identities of the two conspiracies and therefor are defective. However, appellant presents no authority to support his position and proper respect for grand jury proceedings precludes us from adopting it.

object had already been admitted without a contemporaneous objection earlier in the proceedings. Moreover, the trial judge gave a very strong, contemporaneous limiting instruction when the defense finally made its objections. The instruction informed the jury that the fact that Leven and Goodale had pleaded guilty to similar equity skimming charges was irrelevant to the question of the defendants' guilt here.[14] The trial judge also instructed the jury that, while they could consider the details of the purchase by T.L. Corporation from B & G Corporation of two properties which were specified in the indictment, they could not consider any of the other details of the B & G Corporation conspiracy.

While "limiting instructions are not always sufficient to cure the effect of potential prejudice [of improperly admitted evidence]," *United States v. Miller*, 874 F.2d 1255, 1263 (9th Cir.1989), it is usually "presumed that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987); *see also United States v. Charmley*, 764 F.2d 675, 677 (9th Cir.1985). Equally important, the trial judge in this case explicitly asked both defense counsel and the prosecutor whether his limiting instruction was satisfactory; all responded unequivocally that it was. Moreover, as we have already noted, most of the testimony about the B & G Corporation conspiracy was admitted into evidence without objection, and the plain error rule is therefore applicable. It is also relevant that the prosecutor did not refer to Goodale and Leven's testimony in his closing argument. Under all of these circumstances, we conclude that the trial judge's limiting instruction rendered harmless his error in admitting the irrelevant testimony about the B & G Corporation conspiracy.

### VI

▮▮▮▮ Finally, Laykin argues that the jury instruction on the time limits of the conspiracy created three more errors. The instruction given by the trial judge to the

jury listed the starting date of the conspiracy as January 1, 1985, two months earlier than listed in the indictment. Laykin first argues that this makes the dates of the indictment even more remote than before. However, for the reasons given in Section III, *supra*, we find this argument unpersuasive. Second, Laykin contends that the variance between the jury instruction and the indictment violates his right to have a grand jury return the indictment. However, it is clear that when time is not a material element of the offense, as is the case here, the court may constructively amend the indictment without running afoul of the Fifth Amendment. *Krana v. United States*, 546 F.2d 785, 786 (8th Cir. 1976); *see also United States v. Abascal*, 564 F.2d 821 (9th Cir.1977). Third, Laykin suggests that the variance between the indictment and jury charge deprived him of the right to a unanimous jury verdict. This contention is equally without merit. The trial judge gave a general instruction to the jury that its verdict had to be unanimous. Because we do not believe that this is a case in which there is a "genuine possibility" that the members of the jury were confused or that Laykin's conviction was the result of "different jurors concluding that the defendant committed different acts," *United States v. Echeverry*, 698 F.2d 375 (9th Cir.), *as modified*, 719 F.2d 974, 975 (9th Cir.1983), we conclude that the trial judge's instruction was sufficient to secure the defendant's right to a unanimous jury verdict. *See, e.g., United States v. Ferris*, 719 F.2d 1405 (9th Cir.1983); *United States v. Friedman*, 445 F.2d 1076 (9th Cir.1971).

### CONCLUSION

For the above reasons above, we affirm the appellants' convictions on both counts of the indictment.

**AFFIRMED**

---

14. The trial judge properly instructed the members of the jury that they could consider Leven and Goodale's guilty pleas for the limited pur-

pose of deciding how much weight to give to their testimony—in other words, for making credibility determinations.