53 F.3d 341
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Miles G. RAMSEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Miles G. RAMSEY, Defendant-Appellee.
 Nos. 93-30370, 93-30409.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 7, 1995.
Decided April 24, 1995.
 
 Before: SKOPIL, HALL, and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Miles Ramsey was convicted after a jury trial of conspiracy to manufacture marijuana and conspiracy to distribute marijuana, both in violation of 21 U.S.C. Secs. 841(a)(1) and 846. He appeals from his conviction and sentence on several grounds, and the United States cross-appeals from the sentence imposed by the district court. We have jurisdiction over both appeals. We hereby affirm Ramsey's conviction but vacate his sentence and remand for resentencing, because we agree with the government that the district court erred as a matter of law in computing Ramsey's base offense level under the Sentencing Guidelines.
 
 I. Search warrant issues
 
 3
 Ramsey moved in the district court to suppress the fruits of searches carried out at his two residences, referred to as the Moffitt Acres and Long Lake properties. On appeal, Ramsey argues several grounds allegedly requiring reversal and suppression of evidence against him. In particular, he contends that a confidential informant's tip was not sufficiently reliable to support the magistrate's finding of probable cause; that the information contained in the affidavits supporting the warrant applications was stale; that the affidavits did not establish probable cause; and that the warrants were unconstitutionally overbroad. We reject all of these contentions and affirm the issuance of both search warrants.
 
 
 4
 The affidavits in support of the two warrant applications were largely identical. Each opens with a recitation of Drug Enforcement Administration ("DEA") Special Agent Cayford's credentials and several paragraphs of generalized descriptions of the nature of marijuana cultivation and distribution operations. The affidavits then relate information obtained by the DEA from the informant identified only as a "concerned citizen," who supplied the following information:
 
 
 5
 1. Ramsey was the head of a marijuana cultivation and distribution organization; his partners included two men identified as Larry and Keith; someone named Martin was a grower in the organization; the informant supplied telephone numbers for these and other people;
 
 
 6
 2. "Larry" was an alias and this person was wanted as a fugitive in Missouri;
 
 
 7
 3. Ramsey's organization distributed marijuana throughout Alaska, with most sales in remote areas; the organization was selling an average of fifteen pounds per week at $4,000 per pound; the organization bought marijuana from other growers in the area, including one near Copper Center, Alaska;
 
 
 8
 4. Ramsey had been involved in marijuana growing and distribution for at least two years;
 
 
 9
 5. the informant had seen marijuana being grown at several locations, including Ramsey's past residence at Moffitt Acres; the informant also saw bulk packaged marijuana, large amounts of cash, and marijuana cultivation equipment at Ramsey's current residence at Long Lake;
 
 
 10
 6. Ramsey owned a bush pilot service named Wilderness Air, which was being used to facilitate marijuana distribution and launder profits;
 
 
 11
 7. Ramsey had transferred title to two airplanes and some real estate into other peoples' names, in order to hide their ownership from the IRS and law enforcement agencies;
 
 
 12
 8. in March 1992, Ramsey moved from the Moffitt residence to Long Lake.
 
 
 13
 Finally, the affidavits explained that marijuana growing is an energy-intensive process and contained figures relating to the electrical usage at the properties to be searched. The affidavits did not, however, give specific figures for average energy consumption at comparable homes in the areas at issue, and did not directly allege that the figures given for each property, peaking at over 4,000 KwH per month, even during the summer, were unusually high for the area. Compare Presentence Report at p 48 (average monthly electrical usage for comparable homes in Alaska is 1,200 KwH per month). On the other hand, the affidavits stated that periods not covered by the electrical consumption figures in the affidavits "displayed normal or low usage."
 
 
 14
 (a)
 
 
 15
 Ramsey vigorously attacks the information attributed in the affidavits to the confidential informant, arguing that it is unreliable and should not have been used to support the finding of probable cause. We disagree. The trustworthiness of an informant's tip is reviewed under a totality of the circumstances test, including such factors as the informant's basis for knowledge, veracity, and reliability. Illinois v. Gates, 462 U.S. 213, 238 (1983). The trustworthiness of an informant's tip can be bolstered by independent police corroboration of the information supplied. Id. at 241-46 (discussing, inter alia, Draper v. United States, 358 U.S. 307 (1959)); United States v. Miller, 753 F.2d 1475, 1480 (9th Cir.1985). In addition, evidence obtained by firsthand observation carries particularly high indicia of reliability. United States v. Elliott, 893 F.2d 220, 223 (9th Cir.), amended, 904 F.2d 25 (9th Cir.), cert. denied, 498 U.S. 904 (1990).
 
 
 16
 We conclude that the informant information in this case was sufficiently trustworthy. DEA agents verified much of the information relied upon in the affidavit. For example, they put last names to the first names the informant had supplied as Ramsey's alleged coconspirators (Keith Imel, Larry Akery, and Martin Buroker) and verified that the telephone numbers given by the informant for these people were correct. They confirmed that Ramsey listed his current employment as Wilderness Air and that he had transferred title to two airplanes and his Long Lake home into other peoples' names. The agents also confirmed that "Larry Akery" was in fact Billy Wayne Davis, who was a fugitive from Missouri.
 
 
 17
 Some of the information corroborated by the agents, such as the various telephone numbers, addresses, and occupations, was arguably entirely innocent and therefore not probative of the informant's reliability. See United States v. Mendonsa, 989 F.2d 366, 369 (9th Cir.1993) ("[M]ere confirmation of innocent static details is insufficient to support an anonymous tip."). Other items, however, such as the fact that Ramsey had transferred title to the two airplanes and the real estate, while presumably available through public records, are nonetheless more probative of the informant's reliability. See Gates, 462 U.S. at 243-44 n. 13 ("the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts"). Moreover, the facts that "Larry" was an alias and that "Larry" was wanted in Missouri, are the sorts of details not known to the general public, whose corroboration greatly supports all of the information supplied by the informant. Id. at 244 ("[b]ecause an informant is right about some things, he is more probably right about other facts ...") (quoting Spinelli v. United States, 393 U.S. 410, 427 (1969) (White, J., concurring)).
 
 
 18
 Furthermore, some of the description of the "Ramsey organization" attributed in the affidavit to the informant was allegedly observed firsthand (i.e., number five above). Other information could only have been gathered by someone who was inside the organization or privy to its affairs (i.e., numbers three and four above). Such firsthand information greatly enhances the trustworthiness of the informant's information. Elliott, 893 F.2d at 223 (" 'A detailed eye-witness report of a crime is self-corroborating; it supplies its own indicia of reliability.' ") (quoting United States v. Estrada, 733 F.2d 683, 686 (9th Cir.), cert. denied, 469 U.S. 850 (1984)).
 
 
 19
 Another panel of this court held in United States v. Clark, the appeal of one of Ramsey's codefendants, that an anonymous tip relied upon in another search warrant affidavit was not reliable. 31 F.3d 831 (9th Cir.1994), cert. denied, 115 S.Ct. 920 (1995). Clark is, however, distinguishable on this point. There, the court found that the affidavit was "devoid of any indication that the tip [was] reliable" and failed "to divulge the basis for the tipster's knowledge or what steps law enforcement agents took to corroborate the information." Id. at 835. Here, by contrast, it is clear that the tip was based at least in part on personal observation by the informant, and the affidavit enumerates several ways in which the DEA confirmed the informant's information. We hold, therefore, that the informant tip in this case was sufficiently reliable.
 
 
 20
 (b)
 
 
 21
 We also reject Ramsey's contention that the informant's information was stale. Staleness is evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought." United States v. Greany, 929 F.2d 523, 525 (9th Cir.1991) (citing United States v. Foster, 711 F.2d 871, 878 (9th Cir.1983), cert. denied, 465 U.S. 1103 (1984)). Greater lapses in time are permissible when the warrant seeks evidence of an ongoing criminal enterprise or one of a long-term nature, including marijuana growing. Greany, 929 F.2d at 525; see also Angulo-Lopez, 791 F.2d at 1399 ("With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity."). Information is less likely to be found stale when there is no indication that the suspect is aware he is under investigation, because he is unlikely to destroy or remove evidence. Greany, 929 F.2d at 525-26.
 
 
 22
 Ramsey likens this case to Rosencranz v. United States, 356 F.2d 310, 316-17 (1st Cir.1966), in which the First Circuit held that an affidavit which failed to give any indication at all of when either the informant or the affiant had gathered their information created too much risk that the information was stale. Even assuming that this thirty-year-old, out-of-circuit case is good law in the Ninth Circuit, it is readily distinguishable.
 
 
 23
 Agent Cayford's affidavits stated that the "concerned citizen" contacted the DEA on March 20, 1992. The warrant applications were made on May 22, a little more than two months later, after the agents conducted their own investigation to corroborate the tip. Thus, Cayford's affidavits were unlike the one in Rosencranz, which contained absolutely no indication of the time frame involved. Cayford's affidavits further note that the informant stated that Ramsey had moved to the Long Lake residence in "approximately March 1992," and that the informant claimed to have seen marijuana, currency, and cultivation equipment at that house. A reasonable inference to be drawn is that the informant had seen the drugs and related items no more than three weeks before contacting the DEA.
 
 
 24
 This court has consistently noted that evidence tends to remain at the scene of a marijuana growing operation for considerable lengths of time. See, e.g., Greany, 929 F.2d at 525 (magistrate could reasonably conclude that evidence of marijuana growing operation would be present two years after operation began); United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir.1993) (affidavit based in part on four-year-old information not stale because of ongoing nature of drug trafficking operation); see also Affidavits of Special Agent Cayford at p 2 ("drug trafficking is a continuous pattern of illegal substance distribution and not just a single event"). In addition, there is no indication that Ramsey was aware he was under investigation by the DEA, and thus likely to remove evidence. See Greany, 929 F.2d at 525-26. In light of these considerations, we have no difficulty concluding that the informant's information was not stale.
 
 
 25
 (c)
 
 
 26
 We further conclude that the magistrate and district judge did not commit reversible error in concluding that the affidavits established probable cause to search Ramsey's properties. We accord great deference to a magistrate's determination of probable cause and will uphold a search pursuant to a warrant "so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." United States v. Terry, 911 F.2d 272, 275 (9th Cir.1990) (quoting Gates, 462 U.S. at 236). Probable cause is not a demanding standard, and a magistrate need only conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Mendonsa, 989 F.2d 366, 368 (9th Cir.1993) (quoting Gates, 462 U.S. at 238).
 
 
 27
 The magistrate was entitled to rely on the "conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." Terry, 911 F.2d at 275. Here, Cayford was a nine-year veteran of the DEA and alleged that evidence of marijuana grow operations is often found at the homes of the growers. Accord Angulo-Lopez, 791 F.2d at 1399 ("[i]n the case of drug dealers, evidence is likely to be found where the dealers live").
 
 
 28
 The "concerned citizen" information summarized above also strongly supports the magistrate's finding of probable cause. Independent DEA investigation discovered that Ramsey's colleagues had criminal records, including prior drug arrests. In addition to "Larry Akery," who turned out in fact to be Billy Wayne Davis, a fugitive from justice in Missouri, living in Alaska under a false name, DEA investigation also discovered two other members of the "Ramsey organization," John and Donna Yarbro, also fugitives from prosecution in Missouri, and also both living under assumed names in Copper Center, Alaska, where the "Ramsey organization" had allegedly purchased marijuana. The affidavits also contained information about Ramsey's arrest history.
 
 
 29
 The Ramsey affidavits differ considerably from the one found by this court in Clark to be insufficient. There, the affidavit "contain[ed] no information regarding marijuana cultivation, the activity for which Clark was indicted. It suggest[ed] only that Clark and Yarbro knew each other and speculate[d] that they moved together to Alaska." 31 F.3d at 835. The Ramsey affidavits, by contrast, contain direct allegations that drugs and related evidence had been seen at the places to be searched. The Clark affidavit, again unlike those at issue in the present case, also failed to indicate what steps law enforcement officers took to corroborate the information received in the anonymous tip, thus considerably weakening the trustworthiness of the information. Id.
 
 
 30
 Clark did hold that electrical consumption data identical to those listed in the affidavits covering Ramsey's properties were insufficient, standing alone, to establish probable cause. 31 F.3d at 835. That does not mean, however, that the information in the Ramsey affidavits was devoid of all value. While the DEA could have provided more complete information regarding power usage by comparable households in the area, the data provided permit the reasonable inference that Ramsey's power consumption during the listed periods was not "normal or low," but rather was abnormally high. While Clark precludes a finding that this information was independently sufficient to establish probable cause, we nevertheless find that in conjunction with the other evidence in the affidavits, the electrical consumption data support the magistrate's finding of probable cause.
 
 
 31
 Finally, while "[d]irect evidence that contraband or evidence is at a particular location is not essential to establishing probable cause to search the location," Angulo-Lopez, 791 F.2d at 1399, the affidavits in this case in fact contained allegations that the informant had seen marijuana at both the Moffitt Acres and Long Lake properties. The additional circumstantial evidence supported a finding that criminal activity was occurring and that evidence would be found at Ramsey's properties. In sum, the totality of the evidence contained in the affidavits was ample to conclude that evidence of marijuana growing and distribution operations would be found at the properties listed in the warrant applications.[1]
 
 
 32
 (d)
 
 
 33
 Ramsey next argues that the description in the warrants of the items to be searched for was impermissibly broad and did not "particularly describ[e] the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. Ramsey's pretrial motion to suppress did not challenge the search on this basis. Compare Sept. 24, 1992, Order From Chambers (denying Clark's separate motion to suppress, Judge Singleton rejects the magistrate's conclusion "that certain aspects of the warrant were impermissibly broad, requiring suppression of the items").
 
 
 34
 Ordinarily, issues not presented to the trial court may not be raised for the first time on appeal. United States v. Flores-Payon, 942 F.2d 556, 558 (9th Cir.1991); see also United States v. Calabrese, 825 F.2d 1342, 1346 (9th Cir.1987) (declining to consider one defendant's argument because not raised below, while reaching merits of same argument by codefendant who objected in district court). Where, however, the issue involved is purely legal, we have discretion to reach it despite failure properly to preserve the objection. Flores-Payon, 942 F.2d at 558. We exercise that discretion in this case, and reject Ramsey's contention.
 
 
 35
 We review de novo the affidavits and warrants. See, e.g., United States v. Spilotro, 800 F.2d 959, 963 (9th Cir.1986). A warrant's description of the evidence sought must be specific enough to enable the officers executing the search reasonably to identify the things to be seized. Id.
 
 
 36
 The warrants in the present case authorized searches for "Narcotics controlled substances, drug paraphernalia, marijuana cultivation equipment, instructions, notes, cultivation magazines, currency, documents, and records and fruits and instrumentalities of violation of Title 21, U.S.C. Section 841(a)(1)." The Clark court, reviewing an identically worded warrant issued by the same magistrate, found that "the catchall phrase authorizing seizure of 'fruits and instrumentalities of [a] violation of' 21 U.S.C. Sec. 841(a)(1) did not adequately describe the items to be seized." 31 F.3d at 836.[2]
 
 
 37
 There is, however, a significant difference between Clark and the present case. The warrant to search Clark's house did not have the supporting affidavit attached when it was executed. See id. ("Nor was the general phrase of the warrant limited by a description in an attached affidavit."). The Ramsey warrants, on the other hand, indicate that the supporting affidavits were attached and available to the officers who executed the searches.
 
 
 38
 United States v. Hillyard, 677 F.2d 1336, 1340 (9th Cir.1982), held that an overly-general description of the property to be seized on the face of the warrant can be cured if the affidavit supporting the warrant contains more objective, articulated standards to guide the execution of the search, and the affidavit is attached to the warrant. The Cayford affidavits in this case satisfy that requirement. Under Hillyard, therefore, attaching the affidavits to the warrants provided the officers executing the searches with sufficient guidance to avoid the constitutional defect found to exist in Clark.
 
 II. Disclosure of the confidential informant
 
 39
 Ramsey moved in the district court to learn the identity of the "concerned citizen" confidential informant whose tip led the DEA to search Ramsey's properties and arrest him.[3] The government resisted disclosure. The district court ordered the government to disclose the informant's identity to the court in a sealed, ex parte submission. Upon reviewing the government's submission, the district court ruled that Ramsey was not entitled to disclosure of the identity of a "mere tipster."
 
 
 40
 Ramsey argues that under Roviaro v. United States, 353 U.S. 53 (1957), and its progeny, the district court should have ordered the government to disclose the informant's identity to the defense. For a number of reasons, Ramsey's arguments are unavailing.
 
 
 41
 Ramsey claims that "[u]nder Roviaro, the defense was entitled to the informant's identity if the informant participated in the criminal transaction." Brief of Appellant at 25. This overstates the holding of Roviaro and subsequent cases. Roviaro recognized that the government has a privilege to withhold the identity of persons who furnish confidential information to law enforcement officers. 353 U.S. at 59. The purpose of this privilege is to encourage citizens to inform the police of criminal activity, by ensuring informants' confidentiality whenever possible.
 
 
 42
 The privilege, however, is a limited one. In particular, the Court held in Roviaro that "[w]here the disclosure of an informer's identity ... is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Id. at 60-61. In ruling on a motion to disclose the identity of an informer, a court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." Id. at 62. We review the district court's striking of this balance for abuse of discretion. United States v. Spires, 3 F.3d 1234, 1238 (9th Cir.1993).
 
 
 43
 Roviaro itself involved an informant who was a participant in the charged criminal activity. While the Court held that the informant's identity should have been disclosed in that particular case, it also made clear that "no fixed rule with respect to disclosure is justifiable," 353 U.S. at 62, and each case is subject to the balancing test described above. Thus, Ramsey is incorrect that Roviaro states a per se rule requiring disclosure whenever the informant is involved in the criminal activity. Cf. United States v. Long, 533 F.2d 505, 508 (9th Cir.) (refusal to compel confidential informant to testify at trial not error in part because informant was not only witness to offense conduct), cert. denied, 429 U.S. 829 (1976).
 
 
 44
 Instead, the defendant must make "a 'minimal threshold showing' that disclosure would be relevant to at least one defense." Spires, 3 F.3d at 1238 (quoting United States v. Sai Keung Wong, 886 F.2d 252, 256 (9th Cir.1989)); see also Sai Keung Wong, 886 F.2d at 256 ("The burden of proof is on the defendant to show need for the disclosure. The mere suspicion that information will prove helpful is insufficient to require disclosure.") (citations omitted). In his papers in the district court, Ramsey failed to make such a threshold showing. He argued only that he needed to know the informant's identity on the assumption that the person would testify at trial, and Ramsey would need to prepare to "meet their testimony" and to cross-examine the informant. The government negated this basis for disclosure, however, when it responded that it did not intend to use an informant at trial.
 
 
 45
 Ramsey now argues that he should have been allowed to learn the informant's identity, because it would have helped him support his request for a Franks hearing and a hearing on his motion to suppress. To the extent that Ramsey's only hope was to establish that the informant lied to the DEA, then his request is improper because a Franks hearing is limited to exploring misstatements by government actors; to the extent Ramsey wishes to show that Cayford misrepresented the informant's tip, on the other hand, then disclosure might be appropriate. See United States v. Kiser, 716 F.2d 1268 (9th Cir.1983).
 
 
 46
 Perhaps if Ramsey had made this argument to the district court, he would have been entitled to an ex parte hearing at which the informant's identity would have been revealed to his counsel. See Spires, 3 F.3d at 1238 (once defendant makes the "minimal threshold showing," an in camera hearing must be held). Because there appears to be no reason why this argument could not have been made in the district court and the government and the informant might suffer considerable prejudice from disclosure, however, we decline to address it for the first time on appeal.
 
 
 47
 Ramsey also argues for the first time in this court that he now knows the identity of the informant. He asserts that the informant was Brent Champion, who was implicated as a participant in illegal drug activities by Keith Imel's trial testimony and presentence interview. Furthermore, Ramsey points out that Champion was the person to whom Ramsey transferred title to the Long Lake property, and the government argued in its applications for search warrants that such "straw man" transfers are indicative of criminal activity.
 
 
 48
 Even if Ramsey were correct that Champion was the informant, he would not, as noted above, automatically be entitled to disclosure simply because Champion was allegedly involved in Ramsey's illegal activities. Ramsey does not articulate a reason why disclosure would have helped him at trial, in light of his theory that the informant was Champion. If Champion had exculpatory information, Ramsey, as a coconspirator, should have been aware of it regardless of whether the district court ordered disclosure, and could have subpoenaed him to testify.
 
 
 49
 We therefore hold that the district court did not abuse its discretion in declining to compel the government to divulge the identity of its confidential source.
 
 III. Evidentiary rulings
 
 50
 Ramsey contends that the district court erred in admitting a variety of documentary exhibits. He argues that the documents were not properly authenticated and were inadmissible hearsay. With one exception, none of the documents was objected to at trial. We review the admission of the documents not objected to for plain error and easily conclude that no plain error occurred. With regard to the one exhibit to which Ramsey objected at trial, an alleged drug ledger, a review of the entire trial record shows that any error was harmless beyond a reasonable doubt.
 
 
 51
 IV. Duplicitous indictment and variance between pleadings and proof
 
 
 52
 Ramsey claims that counts I and II of the indictment, charging him with conspiracy to manufacture and distribute marijuana, were duplicitous. He also argues that there was a fatal variance between the conspiracy charged in the indictment and the government's proof at trial. Neither argument is persuasive.
 
 
 53
 (a)
 
 
 54
 Whether an indictment is duplicitous is a question of law, reviewed de novo. United States v. Martin, 4 F.3d 757, 759 (9th Cir.1993). "In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." Id. (quoting United States v. Yarbrough, 852 F.2d 1522, 1530 (9th Cir.), cert. denied, 488 U.S. 866 (1988)). In addition, "the grand jury and prosecutor must be presumed to have followed the command to charge but one crime in each count of the indictment." United States v. Mastelotto, 717 F.2d 1238, 1244 (9th Cir.1983) (citing Fed.R.Crim.P. 8(a)).
 
 
 55
 The conspiracy counts in this case were not duplicitous. Count I alleged that "[b]eginning on or about the Spring of 1990, and continuing thereafter until on or about May 27, 1992 ... [the defendants] did unlawfully and knowingly combine, conspire, confederate and agree with each other and others known and unknown to the grand jury, to distribute marijuana" in violation of 21 U.S.C. Sec. 841(a)(1). Count II was identical, with the exception of replacing the word "distribute" with "manufacture." Each of these counts quite clearly charges a single crime. See Martin, 4 F.3d at 759; United States v. Morse, 785 F.2d 771, 774 (9th Cir.), cert. denied, 476 U.S. 1186 (1986).
 
 
 56
 (b)
 
 
 57
 Ramsey's variance argument is somewhat stronger, but ultimately unsuccessful. The superseding indictment charged that "[b]eginning on or about the Spring of 1990, and continuing thereafter until on or about May 27, 1992," Ramsey conspired with a variety of people to distribute and manufacture marijuana. In response to his motion for a bill of particulars, the prosecution informed Ramsey that it intended to prove as an overt act a single distribution of marijuana in Bethel, Alaska, occurring in June 1990.
 
 
 58
 At trial, Keith Imel initially testified that in June 1990, he accompanied Ramsey on a trip to Bethel, where Ramsey sold two pounds of marijuana to Jay Hamlin. Imel later admitted on cross-examination, however, that this trip in fact took place in 1991, rather than 1990. Furthermore, Imel quite clearly stated that the Bethel sale to Hamlin was not related to the conspiracy but was an independent sale by Ramsey, at which Imel happened to be present. Imel further testified that the conspiracy among himself, Ramsey, Buroker, and Akery/Davis was not formed until the fall of 1991, well over a year after the beginning date charged in the indictment. Ramsey argues that these discrepancies add up to a fatal variance between the indictment and the government's proof at trial.
 
 
 59
 We note initially that the evidence at trial did not, as Ramsey suggests, prove the existence of two separate conspiracies. Imel's testimony clearly establishes that a single conspiracy to grow and distribute marijuana began in the fall of 1991. While there was testimony that each of the defendants had grown and sold marijuana prior to that time, the evidence showed that such pre-conspiracy activities were individual and not joint crimes.
 
 
 60
 The proof at trial thus varied from the indictment in two respects. First, the beginning date of the conspiracy proved differed from that alleged. Second, the overt act alleged in the bill of particulars did not fall within the time frame of the conspiracy actually proved. Neither of these variances, however, is fatal.
 
 
 61
 When faced with a claim of variance between the pleadings and proof at trial in a conspiracy case, a reviewing court must first determine whether there was sufficient evidence to send the case to the jury and support the defendant's conviction. Morse, 785 F.2d at 774. In the present case, there was ample evidence to support a guilty verdict on both conspiracy counts, although only beginning in the fall of 1991, not the spring of 1990. In addition, we must determine whether any variance was prejudicial. Id. at 775. We conclude that the discrepancies did not prejudice Ramsey.
 
 
 62
 Time is not a material element of a conspiracy charge. See, e.g., United States v. Harrison-Philpot, 978 F.2d 1520, 1526 (9th Cir.1992), cert. denied, 113 S.Ct. 2392 (1993); United States v. Laykin, 886 F.2d 1534, 1543 (9th Cir.1989), cert. denied, 496 U.S. 905 (1990). Therefore, "the variance between proof and indictment is irrelevant so long as the defendant [was] afforded adequate notice of the charges against" him. Laykin, 886 F.2d at 1543. While the beginning date actually proven was well over a year later than that alleged in the indictment, such a variance was not prejudicial. Ramsey had an adequate opportunity to prepare his defense, as shown in particular by the fact that it was his counsel who exposed Imel's error as to the date of the Bethel marijuana sale. Because the "proof at trial did not broaden or go beyond the allegations in the indictment," but rather proved a narrower conspiracy, we hold that the error in dates was not prejudicial. Morse, 785 F.2d at 775 (emphasis added).
 
 
 63
 Neither was the mistake as to the date of the overt act prejudicial. The government presented ample evidence of a variety of other overt acts which the jury could have found in support of the conspiracy charges. In particular, both Davis and Buroker were convicted on count III, the substantive manufacturing charge relating to the Dome House crop of 167 plants. Since the jury unanimously agreed on this act, which was within the scope and in furtherance of the conspiracy, the fact that the Bethel distribution was outside the time frame of the conspiracy actually proved was not prejudicial. See United States v. Baldwin, 987 F.2d 1432, 1436-39 (9th Cir.), cert. denied, 113 S.Ct. 2948 (1993); United States v. Garza, 980 F.2d 546, 554-55 (9th Cir.1992).
 
 V. Leadership enhancement to offense level
 
 64
 Ramsey argues that the district court erred in increasing his offense level for his role as a leader or organizer of the conspiracy. The district court increased the offense level by two levels, pursuant to U.S.S.G. Sec. 3B1.1(c), which applies "[i]f the defendant was an organizer, leader, manager, or supervisor" of a criminal activity which involved fewer than five participants and was not otherwise extensive. U.S.S.G. Sec. 3B1.1(c) (Nov. 1992). Ramsey contends that the district court's finding that he was a leader or organizer was not supported by a preponderance of the evidence.
 
 
 65
 We decline to reach this issue because we find that it was waived by Ramsey's trial counsel. At one of the sentencing hearings, the district judge concluded, "based upon a preponderance of the evidence, and relying exclusively on Mr. Imel's testimony at [trial], and Mr. Ramsey's testimony at trial, that Mr. Ramsey did play a stronger part in the overall relationship than Imel and Davis, although they were very close." At the final hearing on imposition of sentence, Ramsey's counsel quite clearly waived any objection to the court's finding on this adjustment. Counsel stated that:
 
 
 66
 I have reluctantly, but out of a sense of propriety and fairness, accepted your finding of leadership enhancement; I cannot argue with that. Having met these people, there's no question that they were either all leaders ... but certainly cannot be denied that Mr.--Mr. Ramsey was one of the leaders, so we're not arguing with that.
 
 
 67
 Ramsey is bound by his counsel's concession in the trial court and cannot now challenge the leadership enhancement. See United States v. Olano, 113 S.Ct. 1770, 1777 (1993) ("waiver is the 'intentional relinquishment or abandonment of a known right' ") (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).
 
 VI. Government's cross-appeal
 
 68
 The final issue in this case involves the government's cross-appeal from Ramsey's sentence. The government contends that the district court erroneously excluded the 167 marijuana plants seized at Imel's Dome House from its calculation of the amount of drugs to be charged to Ramsey for purposes of determining his base offense level. Intervening Ninth Circuit authority makes clear that the district court made an erroneous conclusion of law in its application of the Sentencing Guidelines. We therefore vacate Ramsey's sentence and remand for resentencing in light of the appropriate legal standard.
 
 
 69
 The district court sentenced Ramsey for his two conspiracy convictions according to U.S.S.G. Sec. 2D1.1 (Nov. 1992). Under Sec. 2D1.1(a)(3), the base offense level is determined by locating the amount of drugs involved in a Drug Quantity Table. According to U.S.S.G. Sec. 1B1.3(a), the base offense level should be determined, "in the case of a jointly undertaken criminal activity," on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The question is whether the district court properly refused to include the 167 plants (equivalent for sentencing purposes to 167,000 grams of marijuana) seized at at the Dome House.
 
 
 70
 The 167 plants were the object of count III of the indictment, the substantive manufacturing charge. The jury found Ramsey not guilty on this count. In addition, all of the relevant testimony at trial, as well as the presentence report, substantiate Ramsey's claim that he was in Nome, Alaska, when the Dome House plants were planted and grown, and was thus not personally involved in their cultivation. At sentencing, Ramsey argued, and the district court found, that his acquittal on count III precluded reliance on the 167 plants in calculating his base offense level.
 
 
 71
 The district court relied upon two Ninth Circuit cases in support of its conclusion that the Dome House plants could not be counted. Neither of the cases, however, involved conspiracy convictions. As made clear by a subsequent Ninth Circuit decision, both cases are distinguishable.
 
 
 72
 In United States v. Brady, 928 F.2d 844 (9th Cir.1991), the defendant was charged with first degree murder and assault with intent to commit murder. He was convicted of the lesser included offenses of voluntary manslaughter and assault with a dangerous weapon. At sentencing, however, the district court departed sharply upward from the applicable guidelines range, in part based on its finding that the defendant had intended to kill. This court vacated Brady's sentence, in part because the district court's "state of mind" departure effectively punished Brady for conduct of which he had been acquitted by the jury--premeditated murder and assault with intent to kill. Id. at 850-52.
 
 
 73
 United States v. Hahn, 960 F.2d 903 (9th Cir.1992), the other case relied upon by Ramsey and the district court, involved the defendant's sentence upon conviction of illegal possession of a firearm and of one gram of methamphetamine. The trial court included as relevant conduct for purposes of determining Hahn's offense level some forty grams of methamphetamine that he had sold as much as five months before the offense conduct underlying the instant charges. This court vacated Hahn's sentence, holding that "relevant conduct," in order to be counted for sentencing purposes, must satisfy a test of "similarity, regularity, and temporal proximity" to the offense of conviction. Id. at 910.
 
 
 74
 The government argues, correctly, that Brady and Hahn do not control the present case. Instead, this case falls squarely under another decision rendered shortly after Ramsey's judgment and sentence were formally entered. In United States v. Diaz-Rosas, 13 F.3d 1305 (9th Cir.) (per curiam), cert. denied, 114 S.Ct. 1848 (1994), this court held that if a defendant is acquitted of a substantive narcotics offense, the underlying conduct may nevertheless be included as relevant conduct in determining the offense level for a related conspiracy conviction. Diaz-Rosas convincingly distinguished Brady, holding that "a defendant who is guilty of conspiracy to possess and distribute cocaine may properly be held accountable for any cocaine possessed or distributed by coconspirators, so long as that cocaine was foreseeable to him." Id. at 1308 (emphasis added).
 
 
 75
 Under Diaz-Rosas, therefore, the fact that Ramsey was acquitted of personally growing the 167 Dome House plants does not rule out the possibility of those plants being included as relevant conduct on the conspiracy counts. Instead, the district court must determine whether the Dome House operation was foreseeable to Ramsey, despite the fact that he was in Nome when the house was purchased and the grow operation begun.
 
 
 76
 Ramsey argues that the district court specifically found that the Dome House operation was not foreseeable to him, and that this factual finding should not be disturbed because it is not clearly erroneous. We conclude, however, that the record does not support this interpretation. The transcript of the September 10, 1993, sentencing hearing suggests that the district court did not find the Dome House plants to be unforeseeable to Ramsey; instead, the court believed that it was precluded as a matter of law from considering the Dome House plants in any fashion, in view of the jury's acquittal of Ramsey on the substantive charge relating to those plants.
 
 
 77
 Under these circumstances, we vacate Ramsey's sentence and remand for a hearing at which the district court can determine, in light of Diaz-Rosas, whether the Dome House operation was foreseeable to Ramsey as conduct in furtherance of the conspiracy. See United States v. Quinn, 18 F.3d 1461, 1467 (9th Cir.1994) (vacating sentence and remanding in light of intervening judicial decisions).
 
 CONCLUSION
 
 78
 Ramsey's convictions on both conspiracy counts are affirmed. His sentence is vacated and remanded for the district court to determine whether the 167 plants seized at the Dome House were foreseeable relevant conduct in furtherance of the conspiracy, and thus attributable to Ramsey for sentencing purposes.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The Moffitt Acres warrant authorized the search of both the main house and a "house trailer" on the same property. Ramsey argues that the affidavit contained no information which would establish probable cause to believe evidence would be found in the trailer, as distinct from the house. The house and trailer are both on the same property, and are located close to each other. The Moffitt Acres warrant application specifically mentions the trailer and the affidavit provides electrical consumption information for the trailer, showing the same allegedly suspicious fluctuating pattern as was present in the main house. Under these circumstances, the magistrate had a substantial basis to find that probable cause existed to search the trailer
 
 
 [2]
 Clark held that only the portion of the warrant referring to "fruits and instrumentalities of violation of 21 U.S.C. Sec. 841(a)(1)" was overbroad and therefore invalid. By implication, the remainder of the warrant was found to be constitutionally sufficient. Since Clark thus upheld the terms allowing seizure of "instructions, notes, ... documents, and records," we are precluded from considering Ramsey's arguments that those terms are invalid
 
 
 [3]
 Ramsey filed two motions which sought the identity of the confidential informant. One was a Motion To Require Identification Of Confidential Informants, Known But Unidentified Co-Conspirators, and Known But Unindicted Co-Conspirators. The second was his Motion For Bill of Particulars. The district court refused to order disclosure of the informant's identity pursuant to either motion